Good morning, your honors. Good morning. I'm Brian Trachtenberg. I'm joined in this room, but off camera by my colleague, Sarah Samuel. We're pleased to be here today representing individual African American appellant Sharnesz Hager in this de novo review of a granting of summary judgment of all of Sharnesz's claims for race discrimination. The facts of this case that walked into the Chili's in Rosenberg, Texas, asked for a table for seven was told it would be an approximately 40 minute wait. She gestured to an open table behind the house. So we're familiar with the facts. Would you identify for me? What do you say is the evidence of discrimination in that survey you're about to give us? What happened by any person for whom defendants are responsible? That is the evidence of discrimination. Absolutely, Judge Southwick. I would love to. So what happened is Ms. Hager was placed in a wait. A white man walked in later and got the very table that she asked about. Ms. Hager. That's piece number one, it seems to me. We don't know much about the overall situation. It seems to me how many other black people were waiting, how many other white people were waiting, how many were already seated at both races, but at least by itself, free of any other context, you have that. What else do you have? That is correct, Your Honor. And I would add to that, we designated a corporate representative on the facts that you just mentioned, the number of black people waiting, the white people that were seated. They could not give us any of those answers. So you don't have in the record who was seated that night, how many tables were seated, how many staff were on duty. And your client, was client was there? Did she say anything in a statement or otherwise? Relevant to that? Not about how many when she wasn't there, but was everybody else in the restaurant? Why? Everybody else waiting was why? Did she say anything like that? I believe there is testimony that other white people were waiting for tables. It's unclear what size tables they may have been waiting for. So whether they were similarly situated or not, we don't know. I'm sorry, Your Honor. In case of rise and fall on that single piece, what else do you have? Correct. Thank you, Your Honor. So in addition to that, once they were seated, I want to make sure it's clear that the record does reflect, there's no staffing change between the time Sharnes walked in and asked for a table and the time Kevin walked in and asked for a table. So it is not as though Chili's were suddenly magically more able to seat Kevin than they had been Sharnes. So we have the same level of staff. Is there a host though? Is there, I don't know. No, Your Honor. Is the person who first talked to the sole plaintiff here also the person who talked to Kevin Hager? Yes, Your Honor. Okay. Amongst others, there was a group that interacted with Kevin and Sharnes in the second interaction, but it was the same hostess and then joined by others once Sharnes got up and began asking questions and inquiring why she couldn't have the table. At that point, that was about 25 minutes later too, right? That is correct, Your Honor. Okay. So once they were seated, Chili's has a policy that drinks should hit the table within five minutes. And the record reflects that Sharnes and her party were seated. The manager that evening, a gentleman by the name of Frank Sordo, keyed in some manager's notes after the altercation, and in his notes wrote, Kayla, who had been assigned to this table, refused to serve the evidence of discrimination. That is our next piece, but it goes beyond that because once... Let me stop you there. Why is that evidence of discrimination as opposed to evidence of these customers or that customer struck that server or somebody uncomfortable to serve for reasons other than race? I mean, there was already an altercation of sort, was there not? Sure. Yes, there was. And perhaps... Is that really evidence one way or the other at this stage? We all have summary judgments. So you have that on your side. And that's where I was going to go. At most for Chili's, what you've suggested is a fact issue. And the reason why I think we believe and know it to be a fact issue is what comes later. The general manager of that location was written up after all of this for not adequately training, actually I believe the word they used is coaching, his team on bias. And so I believe if it had simply been an altercation, I'm not sure you have to train on bias. The bias video that they talk about, we developed testimony. It was created after a previous discrimination claim against Chili's. So they have a discrimination... But the final piece of which I think is in your collection, though, if I'm missing something, you'll let me know. When Latini, if that's her name, Emily Latini, the server came over and says, I apologize for, and I'm sure you can quote it, for discriminating or some phrase like that. There's a, again, summary judgment. There are a lot of ways to interpret that, it seems to me. I've read some excerpts from depositions that were in your record excerpts, and there probably is more evidence relevant to this than that. What is the backstory on the apology and talking to management and deposition, maybe it's just a single one. There's no really explanation of what kind of a discussion there had been before the server went out there to apologize and whether she was told what to say or not. I'm not sure Mr. Scott's client in the excerpts I read was all that clear. What is in the evidence about the preparation for that apology? At risk, nothing. And the questions were asked. The Chili's executives, there were two that attended the dinner in question, and they both ultimately testified they could not remember quite what was said or what led up to the apology dinner. Now, Sharnese has testified that she had had lots of interactions with Chili's corporate counsel that led to this apology. But there is not extensive or any testimony about how they prepped Lentini or what they may have told Lentini to say. I'll tell my colleagues, I'm not trying to dominate this, but I do have one more question. On your 1982 claim, when does 1982 rights begin in the fact pattern that you have? When might it be that your client, and this is the single client, it's not the other people who are in the group, correct? It's only now Ms. Hager. When did her right to purchase personal property begin? I believe it began when she walked into that location. I believe that you have a right to purchase on the same terms as others. What's the property counsel? It seems to me that the difference there is between contracting, I mean, you sort of seem to me combining 1981 and 1982, not that they don't have some overlap. Right. And Judge Wilson is sort of where I pick it up on this, not saying what he would hold on this. It does seem to me your client wasn't interested in purchasing anything insofar as the facts, as I understand them, indicate. Not to say this would affect your other claims, but what's your best case, if any, and 1982 is not well litigated, to say what you just said? With all due respect, I don't have a case in my pocket to answer your question. I wish I did. I understand your question. I think there is significant overlap between 1982 and the other claims. And I may have misheard you, Judge Southwick. I'm sorry. I couldn't tell if you said that my client did come in to purchase or did not. I will say the testimony is clear. She was looking for dinner. Now, by the time... In the testimony undisputed, she did not, in fact, try to purchase anything once she was seated at the table. Not entirely. She said not at this moment. When a waiter came and took everybody's drink orders, she was upset. The testimony is not at this moment, are her words, and the waiter never returned. And then we have the manager's note saying, Kayla refused to serve the table. Leave you alone. Keep going. Judge Wilson, did you have a question that I can answer for you before I move on? I want to build a little bit on what Judge Southwick was asking, because I had the same question about personal property under 1982. But, you know, the magistrate didn't go here. The magistrate judge sort of presumed that the plaintiff could state activities or come within the statutes, Title II and then 81 and 82. So what's the contract here under 81? The contract would be the purchase of food. I walk in, we have an agreement. But I thought she testified that it wasn't about the food, wasn't about drink. It was about being seated at the table. The contract was to be treated as a real weary person looking for a well-to-be restaurant and an enjoyable evening. That was the contract. It wasn't just the food. I'm afraid I didn't hear that. Oh, well, I'm sorry. It was well said. I'm sorry you didn't hear that. Can you hear me now? Yes, Your Honor. I think that's a little better. She was looking for an enjoyable evening. That was the contract. She wasn't just looking for a piece of food. She wanted to be treated as a welcome guest and have a delightful evening with her kin folks and fiance. So that was the contract. And I agree with that. I was throwing food out because the previous discussion was specific to 1982, which is particular to personal property. And I was conflating Judge Wilson's two questions, I suppose, because he had asked what was the property. But you're absolutely right, Judge Dennis. She was there to enjoy the same sort of evening that anybody else walks into a Chili's or any place else to enjoy. And that starts the moment she walks in. And she was given markedly different treatment. But counsel, I think I'm sorry, but for her, her race, that's what she would have received. That is what the evidence indicates because there's an argument to that effect. In other words, it's not a closed case. The question is, could a jury, a reasonable jury, find that? Yes, Your Honor, I think that's right. And where you have the hostess apologizing for discriminating, the general manager being written up for not training on bias, the hostess being written up for placing my client in what Chili's called a false weight. Remember, it's a false weight in Chili's own words. That's their word. If it were a real weight, if they really couldn't serve her, that's just called a weight. We all know that. We've all waited for a table. Chili's themselves called this a false weight. The manager writing that the server wouldn't serve the table. So I agree with you, Judge Dennis. There is ample evidence to go to a jury that but for her race, this would have gone in a different direction. Well, but she was seated. She was after waiting in a manner that the white patron who walked in didn't have to. Well, he walked in 25 minutes later and they told her at the time she would be a 30, 45 minute wait. She was seated within 25 minutes, right? I mean, I think Judge Dennis stated the contract very well. But my question was going to be, in the contract met when they seated him? No, because she was only seated because she jumped up and called them on the lie that the white patron had reserved it. Had he not been her fiance, that white patron would have gotten that table. That's clear. It's clear from their lie. So it's only after Sharnez asked three times, did this white guy reserve that table? And the hostess ultimately said, oh my God, I'm so sorry when Sharnez said, this is my fiance. It's only there that she received the table. That's a fight that she had to have to get the table that the white person did not have to have. And so is it no longer discrimination because after fighting and making oneself so uncomfortable that she loses her appetite that she got seated, so now we're okay with it. And I think it is still unquestionably discrimination. And I don't want us to lose sight of the fact that the party left ultimately because there was leering and jeering by the staff. This is all in the record. And they were afraid their food was going to be contaminated. That's the record testimony. This is why they stand up and leave after 25 minutes. Now the record shows Chili's has a policy of serving food within five minutes. That didn't happen here. And so I would respectfully submit that she received markedly different treatment than even Chili's intends to give its average patron. Let me ask your counsel. It does seem to me and you've acknowledged as much as I have that there are other ways that ultimately a jury, if it goes to that, would interpret the facts. They would apply probably their own experiences in restaurants and realize a lot of people have to wait. One server may not know what the hostess is saying and vice versa, et cetera. What is your prima facie case have to tell us, have to convince us? There are other, it seems to me it would be fair to say, Mr. Scott will certainly say it. So I'll predict that, that there are other explanations for what was going on related to race. Your client got offended, race becomes an issue. What do you have to show at the initial stage to even move it to needing a response from Chili's? Thank you, Judge Southwick. I've got about five seconds left. Can I answer that? I believe Judge Soutwick can answer whatever question is asked in the time that you need within reason. Thank you, I appreciate that. I believe that we have to show that Sharnes is a member of a protected class and I don't think there's any question about that. I believe we have to show the denial of a right to which she's entitled under one of the statutes or granting of the right but on terms either hostile or vastly different from those granted to others. And so I really, I think... I'm not worried about the legal stand, I'm worried about the facts. What has to be in the facts? Just that it's, I mean, you're talking about Iqbal and Twombly, if you're talking about pleading, it has to be plausible. Is that all we're talking about here? That it's plausible that race was involved as opposed to just the problems and understaffed restaurants not handling the seating of people, cleaning tables, making people wait too long, which is kind of where I start whenever I have to wait a long time at a restaurant. There's a little bit more here. I'm just asking you, what must you show? Yeah, and I almost... Even before Chili has to do anything. Well, I almost think, Judge Southwick, you might be touching on... There is a split both within the Fifth Circuit and outside about whether intent needs to be shown now at the prima facie stage. And Chili says it does. I would submit to you that if you roll intent into the prima facie stage, then you're causing McDonnell Douglas to collapse on itself because that's really the last piece of the McDonnell Douglas analysis. So to answer your question, just at the prima facie stage, I think plausibility is sufficient. It then shifts to Chili's to put forward their excuse for the conduct, and then we have to show some intent. Here, of course, we have an apology, so we're well beyond the realm of plausibility. Thank you, counsel. Yes, good morning, your honors. And on behalf of Brinker, Texas, thank you for the opportunity to be heard today. Excuse me. I think your question so far touched on a couple things. And one of the things that we need to back up just a little bit is, what do these three statutes have in common? They all have in common that they are intentional race discrimination statutes. But beyond that, the US Supreme Court's 2020 decision in Comcast is critically important. That was a section 1981 case. And in that case, the court said that there are two distinct analytical elements that are involved in these statutes. One is deprivation, and the second is causation or motivation. And Mr. Trachtenberg, I believe, has the cart before the horse. So those are two analytically distinct concepts. In the context of this restaurant service case, we have a requirement under section 1981 of a denial of contract under section 1982 of a refusal of service and a right to purchase personal property. And under Title II, which is section 2008, you have to have a showing of a denial of a service in the realm of a public accommodation. But those are analytically distinct. And I think regardless of which path the court takes here, the district court got it right. Summary judgment is appropriate on the clear record. In terms of the deprivation issue, and this was a question that was posed earlier, what is the deprivation? What is the contract here? Well, Ms. Hager, in her sworn deposition testimony, framed that very issue and framed the claim for us. So we don't have to guess. She specifically said, my case is not about food. It's not about drinks. It's all about the table. She also said that no one discriminated against her except for Emily Lentini, who was the hostess that initially engaged her. So back to the court's question, what is the alleged denial of service, or excuse me, what is the contract here, alleged denial of service, that falls within the ambit of protections under these statutes? And according to Ms. Hager, it's the denial of the table. So let's talk about that. Counsel, the point's broader than that, is it the denial of an enjoyable evening out at a restaurant? I mean, in other words, things became hostile. She wasn't honored from the get-go. I mean, doesn't that also violate the contract under Section 1981? I don't think so, Your Honor. If we start looking at an enjoyable evening, you're getting well beyond the realm of the ambit of these statutes, and often the facts will never, never land. Well, but she's entitled, is she not entitled to the things that go along with a table, a meal, drinks, a tech, leave the restaurant? I mean, it's not just that, is it? According to her testimony, Judge, she clearly said that my claim is about the table. She's focused on the table, and specifically the initial wait that she came into the restaurant and asked for a table for seven. It's undisputed at that point that there was no table available. She specifically asked for one table, which were two tables pushed together, and it's also undisputed at that time that that table was not cleaned. There were table, excuse me, there were dishes and plates and glasses on the table. That's undisputed. So that's what caused the wait. Nothing else. I don't understand what you're saying. I'm hearing waiver. If we look at the complaint, we'll see the statutes being talked about, and I haven't looked at it in a while, but I assume there may be broader language. You can tell me if there's not, then you may not know yourself, broader language than you're now saying. But at some stage, I mean, make sure I'm understanding what you're saying. At some stage, this case collapses because of what the plaintiff herself says that this is all about the table. A, is that in a deposition? And then B, have I understood you correctly, that whatever her complaint may say, whatever the briefing may say, what she says is now limited to being given a table? Yes. Yes, Your Honor. So I think the court has to properly look through the prism that was set forth in the Comcast decision. And the very first step is, is there some deprivation of a statutorily protected right? Then we look at her to answer your question, Judge. Yes, she did frame the issue for us because she was asked, what is the deprivation? Deposition? Yes, there it is. So she can waive her complaint. She can waive the breadth of her complaint. She can waive your friend, Mr. Trottenberg's argument by what you get her to say in a deposition. I'm not saying that's off base. I'm just asking, is that your point? I don't view it as a waiver, Judge. I view it as it's her case. And she clearly testified that her case, she framed her case back to the court's question, what is the contract here? What is the denial of service that is protected under these statutes? What right is being deprived? And she clearly testified, Judge, that the focus is on the table. In fact, the magistrate's order, the court district court's order focuses on that very, very point. And that's how she framed the case. So on that. If you're right, and I'm sure you're right, factually, but if you're right legally, that might eliminate the 1982 claim. I really wonder if it eliminates the 1981 claim because as Mr. Wilson, my apologies, Judge Wilson was indicating, when you go to a restaurant, I think the relationship with the restaurant begins when you walk in. And if this restaurant is not interested in whatever category protected by federal law might be of customers, they can start discriminating right away where the people leave without ever getting a table. Once you draw the line a little bit too late in the being at the restaurant. I don't believe so, Judge, because we have to go back to the clear language of the statute and also what the US Supreme Court tells us in Comcast, we have to first show a deprivation of a statutorily protected right. And in the context of these statutes, that means either there was a denial or refusal of service, or a refusal to contract and there was neither. So if you're focused on the table, when she comes in, it's undisputed when at the time she requests a table, there is no table available. She agrees to the way to Judge Wilson's point, then 20 or 25 minutes later, she's initially said, it's going to be 40-45 minutes, but ultimately, she's seated within that time. Now, if you're talking about Section 2008, Title 2, the court, excuse me, Section 19-1 and Section 19-2 Comcast, the court clearly says that it's a but for motivation standard. So even if you're past the initial showing of a deprivation, which she can't get past, she runs into a brick wall there. But even if she gets past that, she admitted her deposition, she was asked point blank. Now, are you saying that you would not gotten a table or receive service had you not had a white person who was her fiance, now husband, Kevin Hager, in your party? And she point blank says, Ms. Hager point blank, testified that no, that's not my claim. I'm not saying that. What I'm saying is the book 81 language, it says, entitled to full and equal benefit of law as enjoyed by white citizens and shall be subject to like, that's irrelevant here, I'm reading the wrong subsection. The right to make and enforce contracts includes the making, performance, modification, termination, the enjoyment of benefits, privileges, terms and conditions. Now, you don't sign a contract when you come into a restaurant, but you have created, it seems to me a contractual relationship, as soon as you engage in some way that says, I want to buy something from you. And so you get in line to buy it. Well, I mean, it's your argument. It does seem to me, though, that the relation, if she says that the problem here is that they treated me differently than they would a white person. I mean, the evidence may not hold it up, but that's her claim, treating me differently than the white person in getting a table. And her evidence of that is a white person comes in and gets the table. Other evidence is that the server is either made to apologize with certain language, or at least does apologize with certain language referring to discrimination, which I think in context, we can say circumstantial evidence meant racial discrimination. You may succeed for other reasons, but I'm just not quite seeing that you, regardless of Comcast, we all need something to wave. And you've got Comcast, but regardless of that, it does seem to me that 1981 is broader there because getting a table is part of the congressional relationship. And there's at least something hovering over this factually, that she was delayed. She wasn't treated, I don't want to look back up again, in the like way and the enjoyment of that contract. So Judge, I think the way I would answer that question is we have to look at some... You heard a question? I guess so. Thank you. You have to have some objective manifestation of a deprivation of a statutorily protected right. And what is that here? Section 1981 says it's the right to make and enforce contracts. 1982 is the right to purchase personal property. And then title two or 2008 is the right to services in a public accommodation context. But regardless, the very first step is you have to show that deprivation of a statutorily protected right. And here, you don't have that. She framed, Ms. Hager framed her claim by her own testimony. It's about the table. She's focused on the weight. And clearly, Judge, she agreed to wait. To an earlier question, what does the record show? She testified that there were other patrons, other guests who were waiting, who are white families at the same time. Actually, it seems odd to me that Kevin Hager comes in, is immediately given a table regardless of racial discrimination or anything else. Is there any evidence? Was there nobody else waiting? I know the party of six was waiting. Why would he be given? Is there any explanation of why he would be given a table? And somebody just walks in and a lot of people are waiting. Yes. So a couple of things. One, the evidence is that he was waiting out in the car, that he is part of Ms. Hager's party, of course, when she comes in and requests the table. But more importantly, and this goes to Judge Wilson's question earlier about the lapse of 20 or 25 minutes. It's undisputed when Ms. Hager comes in and asks Ms. Emily, the hostess, for a table, that at that point in time, the table she's referring to is dirty. It's not clean. There's absolutely no evidence in the record that there was a server available to wait on that table at the time. Now, Mr. Trachtenberg talks about the concept of a false weight, and that's a misnomer because there's actually nothing associated with any sinister motive or racially discriminatory motive associated. We've all experienced that. Aren't you overlooking the way they treated Ms. Hager? No, Your Honor, I don't believe we are. They welcomed him with open arms, didn't they? No, Judge, I think that... Oh, we're moving on right away. And I think that the difference, and we need to talk about that a little bit, is if... I think plaintiff is trying to suggest that someone was treated differently, and as the court knows, to meet that standard of similarly situated person, you have to show that that person was treated differently under nearly identical circumstances. And there's plenty of Fifth Circuit case law on that. Here, to Judge Wilson's earlier point, there's a 20 or 25 minutes. In the restaurant world, it's critical because in the restaurant world, it's a highly fluid situation. We have a lot of moving parts. We have hostesses. We have servers. We have managers. All of these people are trying to do their best to seat people, but it's a very fluid environment. We're in the record. I'm sorry to interrupt you, but I want to kind of nail this point down, I guess. Is it known by the Chili staff that Mr. Hager is part of the party that's been waiting for 20 to 25 minutes at the time he comes in? In other words, when... I'm not talking about like he... Well, there was somebody missing from Ms. Hager's party. I'm saying when he walks in, when did they know that he was part of that party of eight or seven? Well, I believe the testimony is, Your Honor, then when Mr. Hager comes in and says... And there's a little bit of a variance here, but when he comes in and says, how about that table? Why is that table not available? Then Ms. Hager says, hey, why are you talking to him and why are you telling him that he was part of that same party? But to the point of similarly situated, which I think is important, there's a difference in that 20 to 25 minutes. And the difference is at 20 or 25 minutes, there's another server that says, hey, I see that this party is getting restless. I'm going to come up here and do whatever I can to serve that table and clear the table at that point. The magistrate judge said something in the report and recommendation that there was evidence that, I guess, Lentini had lied to the plaintiff to cover up bad service, short staffing, a false weight, which I think is a restaurant term, and not that there's evidence that Lentini lied to cover up discrimination. I mean, I'm looking at the magistrate judge's report. Isn't that fact finding? I mean, is that improper to reach that conclusion on summary judgment as to why Lentini may have lied? I think the point that the magistrate judge, as I understand it, was trying to make is that Brinker's not saying as the reason. If you get down to the second part of the analysis, if you're past the deprivation of right, and now you're past the deprivation of right, and now you're past the deprivation of right. At that point, the judge is just making a distinction that Chili's and Brinker did not offer as an explanation that Mr. Hager, the fiance, reserved the table. They're not saying that. So, the fact that you're is really immaterial because that is not the articulated explanation. The articulated explanation, again, if you get down to the second rung of the analysis, which is causation or motivation, is, you know, why was that taken? What caused the delay? It's short staffing. It's just management, whatever it is, but not discrimination. But then the magistrate judge goes on to say, well, the only evidence, and this may go maybe toward pretext, but the only evidence of discriminatory intent is nothing more than the plaintiff's subjective belief that Lentini didn't offer her a table because of her race. Well, I'm a little confused by where the apology and the other evidence that counsel opposite talked about, does the magistrate judge just miss that or disregard it? How does Lentini's apology fit into this? I mean, is it competent evidence? Where is it in the record? Okay, this is probably a good time to shift over to, I wanted to address briefly, I have a couple minutes left, some of the questions that were posed earlier. And I believe, Judge, that the answer to your question is that the context of that apology that came up earlier, that alleged apology was made about a month after this visit. The visit was on March 31st, 2017. And as part of Chili's efforts to make sure that the guests understood that we appreciate her, we invited her to come back to the restaurant. She comes back in April, about a month later. And that's the context. This didn't happen at the time. But is it enough to, is it enough to create an issue of fact with regard to It is not. And this gets back to a point that Judge Southwick made earlier, which is, there could be any number of reasons why someone apologizes. There's no link whatsoever to race. There's no, I'm sorry for discriminating against you. And she's saying that to a black woman. I mean, isn't that circumstantially enough? It is not judge. It's not it's not it's certainly not direct evidence because it doesn't leave. It doesn't prove racial discrimination in the deprivation of any service or contract, you know, on its own by itself. Let me change the apology just a bit, Mr. Scott. What if it was as clear as it could be? And Emily Lettini, I think that's who gave the apology, says, I apologize to you for not seizing more quickly than I did because of racial discrimination. I did it because I don't think he's talking to us. I did because of racial discrimination. I mean, there we have clarity. But we still have the month wait, we don't know the motivation was Chili's telling you that you're telling her you had to say that whatever. I, you know, I see a lot of explanations that would undermine that. But it seems to me that it still well, you call it direct evidence or not. It is evidence relevant for summary judgment that racial discrimination was the motive behind this. And it's just hard to get to write that out of the record. So I'm all I changed was to make it much clearer. And you're saying it's not all that clear as racial discrimination. Let's take that out. Let's say it's as clear as could be. She apologized for racially discriminating. Isn't that at least something to stop from your judgment? And you can take more than one second to answer. And I know that was a hypothetical judge because that's not our facts here. For the law, why isn't if we say that it's at least circumstantial evidence? Why isn't it enough to prevent summary judgment? Well, at that point, Judge, I think if you if you had a statement where someone came in, it'd be analogous to a manager coming in and saying we're firing you today because of your age. And we need new blood here. And we have too many older workers around here, there will be no question as to what the employer's intent was. Here we have a month after the fact we have a hostess who's a teenager who's coming out and doing her level best to try to say, hey, you know, this is what happened. Ms. Hager says, oh, she told me that I was being discriminated against or apologized for being discriminated. What does that mean? In the context of what does that mean? That I'm apologizing because you didn't get seated sooner? Does that mean I'm apologizing because that I discriminated against you because of your race? There's absolutely nothing in the record that ties any of these actions, including that apology to race. So if you get to the second level of the argument, which I don't think you do, I don't think you get past the deprivation here. But even if you get to the second level of it, the claim also fails. And the district court got it right. Because Ms. Hager testified that no one made any racially derogatory comments. There's absolutely no evidence of any racial motivation or intent. And it and back to the law judge, all of these statutes absolutely require a showing of racial animus or intent. And there is none, none whatsoever in this record, including the after the fact month later apology. My question answer. Thank you. Well, I asked you another one. Yes. Okay. Your time is elapsed. Thank you, Your Honors. I want to highlight and point out Chili's themselves in their briefing. Before you have said, it is Charnes, who raised race that they have they have screamed from the mountaintop that Charnes made an issue of her race. We know from the manager's log notes that night, he sat down and wrote a woman complained of race discrimination. Now, the suggestion seems to be that a month later, when Emily Lantini apologized for discriminating, because she didn't use the word race, who knows what she was apologizing for? I would respectfully submit at best, that's a fact question. But the reality is, when you construe the facts in the light most favorable to the non moving as you should, it's very clear that Emily Lantini knew what she was apologizing for knew what form of discrimination was at issue. I want to next address a couple of 20 to 25 minutes that we're talking about. Specifically, they did not bring on additional staff. That is clear in the record. They have the same number of staff before and after. The table that Mr. Scott for some reason said two or three times was dirty when Charnes asked for it was dirty when Kevin asked for it. The record is very clear in Kevin's deposition that as soon as he asked for a table, they moved to clear that table. And so there is, you know, Section 1981 A's description of the statement of equal rights, remember ends by saying that everyone shall be subject to like punishments, pains and penalties. So it's not just the achievement of benefits, but it's the punishments, pains and penalties. If one person is made to wait 25 minutes for that, which another is not, I would respectfully submit we do have a deprivation, we do have an equal rights problem. I'm sorry. No, go ahead, Judge Wilson. Well, I was just going to ask about counsel's point that by the time Mr. Hager walked in, the staff at Chili's knew that he was part of that party that had by that point been waiting 20 or 25 minutes. There's absolutely no evidence of that. Why on earth then would Emily Lantini say to Charnes, this gentleman reserved the table? That simply doesn't add up whatsoever. Stop you there because I don't think what she thought matters. Is there any evidence from Chili's? And I think Mr. Scott, who may represent all Chili's, I don't know, most of us prefer to Brinker. But regardless, is there any evidence from witnesses for Brinker that they thought he was connected and your client wasn't aware of it? Absolutely not, Your Honor. That's good. That's good. Yeah. No, there is no such evidence. And thank you for those questions. I want to lastly address this concept of waiver to the extent necessary. I want to point out a couple of things. First of all, Mr. Sorto, the manager's note saying Kayla refused to serve the table, that was produced to us after Charnes' deposition. So when Charnes sat there and said, this is who discriminated against me, she didn't know behind the scenes that a waitress had refused to serve her table. That's number one. But number two, I also want to point out that later in that same deposition, counsel took Charnes through her then live pleading and said, is everything in this true and correct? That's at the end of the deposition. So while I will concede that when you pluck a deponent's words out of context, it can hurt. And what I like Charnes to have answered differently, perhaps at the end of her deposition, she absolutely affirmed that which was stated in her live pleading. But then we sought leave to amend her petition and add facts and were granted leave to amend her petition and add specifically the facts about the leering and the jeering that occurred after she was seated. And so we asked for and were given permission to beef up the claim that arises after she was seated. And I do not believe that she then waived those claims by sitting in the deposition. I think that could be great impeachment testimony for Mr. Scott. And I would like nothing more than for you all to say, head back down to a trier of fact. And if he wants to wave that over Charnes' head, we can do that. I do not think that it creates a summary judgment moment whereby my client magically waived her claims. That is really all I have, but I'm happy to answer further questions. Nothing for me, Jim. Thank you. No more questions. Thank you, Mr. Brankenberg. The case will be submitted. And this panel will adjourn and sign it up.